

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00208-CV

_____

In re: the Commitment of Raul Villegas Garza

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. C2022596

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

Appellant Raul Villegas Garza challenges his civil commitment as a sexually violent predator, s*ee* Tex. Health & Safety Code Ann. Ch. 841 (the SVP Act), raising a single issue in which he argues there was legally insufficient evidence to support the jury's verdict that he has a behavioral abnormality making him likely to engage in future predatory acts of sexual violence. Because the evidence is sufficient to support the jury's verdict, we will affirm.

## I. INTRODUCTION

The State filed a petition to civilly commit Garza as an SVP based on his previous convictions and sentences on four counts of indecency with a child by contact under Section 21.11(a)(1) of the Texas Penal Code. All four are considered sexually violent offenses for purposes of the SVP Act.[1] *See id.* § 841.002(8)(A). Garza had also been subsequently convicted of one count of tampering with or fabricating evidence under Texas Penal Code Section 37.03, which is not a sexually violent offense for purposes of the SVP Act, but which was a factor in the analysis of his risk

---

[1]Garza was convicted by a jury of two offenses of indecency with a child by contact against each of two child victims, four offenses in total, in 2004. He was sentenced to 20 years' confinement for each offense, to be served concurrently.

2

to reoffend due to its relation to his previous indecency convictions.[2] *See infra* Section II.A.

Besides Garza, only one other witness testified at the jury trial: the State's expert, Dr. Jason D. Dunham, Ph.D. Dr. Dunham testified that Garza is a repeat sexually violent offender and suffers from a behavioral abnormality that predisposes him to engage in predatory acts of sexual violence. In contrast, Garza testified that he did not commit any of the offenses for which he was convicted, will not commit future offenses, and is and always has been incapable of sexually assaulting anyone.

The jury rejected Garza's contention, answering "Yes" to the charge question, "Do you find beyond a reasonable doubt that [Garza] is a sexually violent predator?" The trial court then ordered Garza civilly committed in accordance with Section 841.081 of the Texas Health and Safety Code, and this appeal followed.

## II. BACKGROUND

At a trial on a State's petition seeking civil commitment, the jury shall determine whether they believe beyond a reasonable doubt that the person is an SVP. *Id.* § 841.062(a). A person is an SVP if that person "(1) is a repeat sexually violent

---

[2]In 2014, while incarcerated for his previous offenses, Garza was convicted by a jury of tampering with or fabricating evidence and sentenced him to 20 years' confinement, concurrent with his previously imposed sentence.

offender;[3] and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." *Id.* § 841.003(a)(1), (2). "Behavioral abnormality" is statutorily defined as "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2).

A commitment proceeding under the SVP Act is the rare civil proceeding that incorporates the "beyond a reasonable doubt" burden of proof typical of criminal cases. *See id.* § 841.062; *In re Commitment of Fisher*, 164 S.W.3d 637, 639–41 (Tex. 2005). Legal-sufficiency review in civil cases with this burden is consistent with review in criminal cases: the reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *In re Commitment of Stoddard*, 619 S.W.3d 665, 674–75 (Tex. 2020) (*quoting Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979)).

In addition to testimony, the evidence at trial consisted of Dr. Dunham's curriculum vitae and the penitentiary packet containing judgments from Garza's four

---

[3]A repeat sexually violent predator is a person who is convicted of more than one sexually violent offense for which a sentence is imposed for at least one. Tex. Health & Safety Code Ann. § 841.003(b).

convictions for indecency with a child by contact and his conviction for tampering with or fabricating evidence.

## A. Dr. Dunham's Testimony

Dr. Dunham is a licensed forensic psychologist. His decades' long practice consists of evaluations and consultations in legal proceedings, specializing in sex offender evaluations. At the time of trial, he had performed 321 evaluations in sex offender cases in Texas.

In conducting civil commitment evaluations, Dr. Dunham reviews an individual's records, interviews the individual, conducts testing, and reviews test results to evaluate the individual's risk of reoffending. Dr. Dunham testified that in evaluating Garza, he used methodology that accords with his training as a forensic psychologist and that he believes is within the accepted standards in the field of forensic psychology.

After reviewing Garza's pertinent records, Dr. Dunham prepared a profile in preparation for his first interview with Garza, then honed his opinion as he received new information. Dr. Dunham evaluated Garza using a clinically adjusted actuarial approach incorporating the Static-99R, an actuarial test, and adjusted for observed behaviors that were not reflected in the test.

Dr. Dunham interviewed Garza twice. The first interview lasted approximately 90 minutes, which Dr. Dunham considered adequate to conduct an initial evaluation. Based on his review of the records and his first interview with Garza, Dr. Dunham

formed the belief, based upon his training, education, and experience, that Garza has a behavioral abnormality that makes him likely to engage in predatory acts of sexual violence. After receiving additional information about unindicted and unadjudicated allegations and other alleged victims, Dr. Dunham met with Garza a second time, about a year later. His initial beliefs remained unchanged after the second interview.

Based upon his education, training, experience, and methodology used, Dr. Dunham determined that Garza suffers from a behavioral abnormality that makes him likely to engage in predatory acts of sexual violence. More specifically, Dr. Dunham found in his document review and interviews that Garza suffers from the behavioral abnormality of paraphilic disorder, a chronic sexually deviant attraction to prepubescent and pubescent girls, and shows traits of antisocial personality disorder.[4]

### 1. Convictions for Sexual Offenses

Dr. Dunham reviewed records related to Garza's four convictions for felony indecency with a child by contact, against two victims. By way of background, Garza met the mother of the two victims in November and married her on Christmas day, two months later. In a subsequent deposition, Garza explained that he married

---

[4]Antisocial Personality Disorder is a pattern of disregard for and violation of the rights of others, indicated by one or more factors including the following: failure to conform to social norms with respect to lawful behaviors as indicated by frequently performing acts that are grounds for arrest; deceitfulness, as indicated by repeated lying; impulsivity; consistent irresponsibility; and lack of remorse. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 301.7 (5th ed. 2013).

because he wanted to be a father and that he liked children and wanted to help his wife raise her children.

Within six weeks of the marriage, Garza's third, Garza sexually offended against the older of his two victims by touching her breast and causing her to touch his penis. Documents Dr. Dunham reviewed indicated that Garza also kissed her and put his tongue in her mouth, although this did not form a basis for Garza's two convictions related to this victim.

Around the same time, Garza also offended against this victim's younger sister. Garza rubbed his body on her body and also touched her anus. Documents Dr. Dunham reviewed also indicated that Garza kissed her with his tongue, although, again, this did not form the basis for Garza's two convictions related to the younger victim. Because the offenses were not isolated events, but rather occurred over the course of a week, Dr. Dunham considered them to indicate a heightened risk to reoffend.

Dr. Dunham reviewed deposition testimony by Garza that raised concerns with him that Garza's actions included not just sexual contact, but also "grooming" behavior. According to Dr. Dunham, grooming—the process of setting up an offense and making an opportunity to offend more likely to happen—is a factor to be considered in assessing the risk to reoffend. Dr. Dunham pointed to other evidence that, in his opinion, also showed that Garza had pursued a woman with young girls to get access to them. Dr. Dunham explained that Garza engaged in this grooming

process, by first marrying their mother to get access to the girls, and then by grooming the girls by sitting on the bed and talking to them, then talking about sex, and then rubbing the older victim's breast while applying a poultice to treat a cold.

At Garza's criminal trial, the older victim said that Garza told her that he wanted her to be his mistress, that he wanted to take her to a hotel to have sex, and that she would not get pregnant because of his inability to have children. *See infra* Section II.A.6. The younger victim said that Garza told her that he found her "sexier" than her older sister and that she had a "better built body" than her older sister.

## 2. Unadjudicated Sexual Offenses

Dr. Dunham also reviewed records reflecting unadjudicated sexual offenses Garza allegedly committed. In those records Dr. Dunham reviewed testimony from other girls who came forward to talk about what they alleged Garza had done to them.

In that review, Dr. Dunham considered testimony from a member of Garza's family who had testified during Garza's criminal trial for the indecency offenses that Garza had abused her multiple times when she was between the ages of 11 and 16. She alleged that over that five-year period Garza had kissed her with his tongue and touched her chest and genitals and told her he wanted to have sex with her. This

8

unindicted offense represents the earliest instance and discovery of Garza's sexual deviancy of which Dr. Dunham was aware.[5]

Another member of Garza's family testified at his criminal trial that he sexually assaulted her in a church bathroom when she was ten years old. She reported the assault, and Child Protective Services investigated the allegations. Although Garza was not charged with a criminal offense,[6] his family members were aware of the accusations and confronted him about them.[7]

Additionally, Dr. Dunham reviewed testimony from Garza's indecency trial related to a third prior victim of an unindicted offense, which occurred sometime between the two unindicted family-member offenses and the indecency offenses for which Garza was later convicted. In that situation, Garza romantically pursued the third victim's mother, his second wife, and married her after a short courtship. The mother testified during Garza's later trial that Garza touched her young daughter on the "bottom" and kissed her. After this discovery, the mother and Garza divorced, and the mother filed a protective order against Garza.

---

[5]Garza's alleged sexual contact with this family member was discovered by adult members of his family who informed authorities.

[6]The grand jury considered the charge but did not indict Garza.

[7]According to trial testimony, when an adult family member learned of the allegations against these two family-member victims, she slapped Garza and told him, "Do not contact my family. I will call the police."

9

Dr. Dunham believed that this offense showed a similar "grooming" pattern to the offenses for which Garza was subsequently convicted—pursuing a victim's mother romantically, marrying her after a short time, and then offending against the minor child very soon thereafter.

In Dr. Dunham's opinion, these offenses were examples of manipulative conduct demonstrating antisocial behaviors and an increased likelihood of reoffending. He observed that Garza's actions were indicative of lifelong behaviors consistent with paraphilia, a sexual attraction to prepubescent and pubescent girls.

Because most sexual offenders do not reoffend after the point of first "detection"— discovery of their offenses by others—Dr. Dunham considered the family's confrontation and CPS's official investigation to constitute detection of Garza's offenses against his family members, even absent an indictment. The subsequent unindicted offense against the daughter of his second wife also constituted recidivism, which was then detected by the mother who confronted Garza, filed for divorce, and obtained a protective order. And the criminal offenses, Dr. Dunham said, constituted detection of yet another incident of recidivism after detection. Garza's pattern of offense, detection, and recidivism indicated to Dr. Dunham that Garza is unable to control his impulses and so he is likely to engage in future acts of sexual violence.

### 3. Discipline Issue while Incarcerated

Dr. Dunham also related an incident in which Garza, while incarcerated, wrote a letter to try to establish an inappropriate relationship with a correctional staff member. In that letter, Garza told the staff member that when he was released, he wanted to marry her. Garza barely knew the staff member, but his letter indicated that he knew she had young children. This behavior indicated to Dr. Dunham that Garza was engaging in the pattern of grooming behavior he had used in previous offenses, i.e., pursuing a woman with young children to marry after knowing her for a very short time.

### 4. Conviction for a Related Non-Sexual Offense

Dr. Dunham also reviewed records related to Garza's conviction for tampering with or fabricating evidence. Although this offense is not a sexually violent offense under the SVP Act, it was related to his four convictions for sexually violent offenses and to his previous unindicted offenses.

According to the 2014 indictment, Garza fabricated an affidavit from his second wife, in which she purportedly recanted testimony about his abuse of her daughter and stated that she had lied under oath at trial. To this affidavit, Garza affixed a false notary seal, and he attached the affidavit to a petition for a writ of habeas corpus concerning his four convictions.

The indictment also accused Garza of fabricating an affidavit from a doctor claiming that Garza could not have sex and had no capacity for sexual arousal, and so

11

would have no interest in committing sexual offenses. This fabricated letter was also attached to the petition.

Garza denied he filed the affidavits at all, but admitted he was convicted of tampering with or fabricating evidence and sentenced to another 20 years' confinement, concurrent with the terms already commenced for the indecency offenses.

Dr. Dunham testified that this kind of manipulative behavior, combined with the grooming behaviors he observed, is also consistent with traits of antisocial personality disorder, indicating a heightened risk of engaging in predatory acts of sexual violence when coupled with sexual deviance such as paraphilia.

### 5. Dishonest behavior

Dr. Dunham also believed that Garza demonstrates pathological lying behaviors. He based his belief not only on Garza's conviction for tampering with or fabricating evidence, but also on Garza's inconsistent statements about his sex drive and his personal history of abuse as well as his continual denial of having ever engaged in conduct that would constitute a sexually violent offense. And, due to the ease with which Garza told lies, Dr. Dunham characterized the behavior as pathological lying.[8]

---

[8]In Dr. Dunham's opinion, pathological lying would constitute a barrier to any treatment process.

For example, in his interview with Dr. Dunham, Garza stated that he had no sex drive, never had an erection, and had never had sex. However, when he was interviewed during the CPS investigation that eventually led to his convictions, Garza told investigators, "I was having wild sex with my wife. I don't know why this is happening to me."

Garza was also deposed by the Office of Special Prosecution Unit when the state made its initial motion to civilly commit him as an SVP, and in that deposition, Garza said that he was sexually abused by his uncle on one occasion but not by his father. Yet in his interview with Dr. Dunham, he said he was continuously abused by his father for a period of years and not abused by his uncle.

Another example of Garza's dishonest behavior arose during his testimony in the civil commitment hearing. Contrary to the testimony of the mother of the victims of his two criminal indecency charges, Garza said twice that he did not grab her arm to stop her from leaving the house when she fled with her children to end the relationship. Yet when confronted with a transcript of his prior deposition testimony admitting that he did grab her arm, he admitted to grabbing her arm.

Dr. Dunham observed that Garza denied and continues to deny that he ever engaged in behavior that would constitute improper sexual contact with a child and has never shown remorse or guilt. In Dr. Dunham's analysis, Garza's dishonest behavior, lack of personal responsibility, and lack of remorse indicates a high risk to reoffend and would present a barrier to potential future treatment.

13

## 6. Garza's Hypersexuality

According to Dr. Dunham, Garza insists that he is and has always been incapable of sexual arousal or sexual activity because he was born without testicles and has required testosterone shots for most of his adult life because his body does not create that hormone. But the records that Dr. Dunham reviewed belied that claim. To the contrary, those testosterone shots actually heightened Garza's sexual arousal. Dr. Dunham believed that those records show that Garza is hypersexual, which is consistent with his ex-wives' testimony that Garza would, for example, have sex with them and then masturbate afterwards. And both ex-wives testified that Garza was able to have an erection and have penetrative sex. Garza even told investigators during one interview that he and the mother of the victims had had "wild sex," which in Garza's estimation indicated that he would not have had reason to sexually offend against the two child victims.

Dr. Dunham opined that this showed Garza's inability to control urges, as Garza had had a sexual relationship with his wife, a consenting partner, but still had committed sexual offenses against the child victims. Dr. Dunham noted that Garza's hypersexual behavior, having sex with his partner and offending against children, appears to have begun during his previous marriage and repeated itself, indicating a pattern of behavior and an inability to control sexual urges toward prepubescent and pubescent girls.

14

### 7. Psychological Tests and Actuarial Risk to Reoffend

As part of his evaluation of Garza, Dr. Dunham administered the Hare Psychopathy Checklist Revised test (PCL-R) and the Static-99R test for factors indicating a likelihood to reoffend.

#### a. PCL-R Test Results

According to Dr. Dunham, the PCL-R measures the degree to which someone has psychopathic characteristics. The test is divided into two factors: (1) internal, personal characteristics; and (2) external, behavioral characteristics. Garza's overall score placed him within a moderate range of psychopathic characteristics, so Dr. Dunham does not consider Garza to be a psychopath.

However, Garza's PCL-R score in the antisocial external behavior factor was high, including glibness and superficial charm; pathological lying and manipulative behaviors; arrogance and narcissism; and a "victim stance"—that he was a victim and had no victims because he had never offended against anyone. Dr. Dunham stated that a score in a high range in one factor still shows a danger of reoffending, even if the score in the other factor is low enough that the overall score falls in the normal to moderate range, as is the case with Garza. While not sufficient for a diagnosis as a psychopath, Dr. Dunham stated that these behaviors were characteristic of an ongoing predisposition to commit sexually violent offenses, and the results contributed to Dr. Dunham's conclusion that Garza suffered from a behavioral abnormality.

### b. The Static-99R

As Dr. Dunham explained, the Static-99R is an actuarial risk assessment that uses ten factors to estimate the likelihood that an offender will be convicted again after release. The Static-99R generates an overall score between negative three and twelve. Garza scored a negative one, a below average risk, on the test.

Garza's below-average-risk score was based on six factors: (1) Garza has never lived with a partner for more than two years; (2) Garza will be 63 years old at the time of his projected release; (3) Garza's sentence for his four sexual offenses was imposed in a single sentencing event; (4) None of Garza's victims were related to him; (5) None of Garza's victims were strangers to him; and (6) None of Garza's victims were male. All but one of these six factors indicated a lower risk of recidivism. Only the first factor—having never lived with a partner for more than two years—indicated a higher risk of recidivism for a first-time offender[9] convicted of a sexually violent offense.

Dr. Dunham explained that the test, while a useful tool, uses only common factors for reoffending, so it is not a flawless predictor of a person's risk of reoffending; there are other factors not reflected in the test that should be considered. Thus, Dr. Dunham considered the Static-99R just one part of an overall evaluation—

[9]Because Garza's convictions were in a single sentencing event, he is treated as a first-time offender under the Static-99R scoring rubric.

a "piece of the puzzle" in the standard clinically adjusted actuarial approach as encouraged by the test's authors.

For example, there are behaviors indicating a heightened risk of recidivism that are not reflected in the Static 99-R test results, such as attraction to prepubescent girls and remorselessness. According to Dr. Dunham, Garza demonstrates both of these behaviors, which, in Dr. Dunham's opinion, contributes to his increased likelihood to reoffend. Dr. Dunham also pointed to Garza's letter to a correctional staff member as indicative of a desire to reoffend because it appeared to be "grooming" behavior.[10]

Despite Garza's Static-99R test scores indicating that Garza would be at a low risk of reoffending, Dr. Dunham considered Garza a recidivist, as he had already reoffended after discovery. *See supra* Section II.A.2. Garza was accused of sexually abusing his family members and was confronted; he was accused of sexually abusing the daughter of his second wife, which resulted in divorce and a protective order; and then he committed indecent contact offenses against the children of his third wife and was convicted. According to Dr. Dunham, persons who reoffend after discovery of sexual offenses are more likely to be rearrested and reconvicted in the future. In sum, Dr. Dunham opined that the Static-99R result, without consideration of Garza's overall history and behavior pattern, underestimated Garza's risk to reoffend.

## B. Garza's Testimony

---

[10]According to Dr. Dunham, an explicit desire to reoffend immediately upon release is not a factor reflected in the Static-99R result.

Garza testified that he was born in 1960, that he had a hard upbringing, and that he "had a rough dad, a sick man." Garza claimed that his father had sexually abused him from the ages of 8 until 15 and that his father also abused everyone in his family except Garza's youngest brother and oldest sister. He said in the deposition that he blamed his uncle for the abuse because he was embarrassed of what his father did.

Garza dropped out of school in tenth grade and worked at Goodyear until he left home. Garza worked at Goodyear locations until he started his own auto shop. He ran his business until 2002, when he had double knee replacement surgery and took a job teaching automotive repair at Fort Worth ISD. In his deposition, Garza stated that his intention upon release was to work as a school counselor, although at trial he said that he would not pursue the job if that would protect him from "going through all of this again."

Garza denied all allegations against him. He denied being aware of allegations that he had sexually abused one of his family members (the second of the two unindicted offenses) until Dr. Dunham asked him about it during his interview. Referring to his alleged sexual abuse of the victim of the first of the unindicted offenses, he stated that he "was found not guilty of that through CPS."

## III. DISCUSSION

18

Garza argues that the evidence is legally insufficient to support the jury's finding that he suffered from a behavioral abnormality.[11] We disagree.

Dr. Dunham based his opinions on Garza's criminal case records, police reports, victim statements, witness statements, educational records, treatment records, medical records, prison records, parole case summary records, deposition transcripts, test results, and his two interviews of Garza. After considering this information, Dr. Dunham diagnosed Garza with sexual deviance in the form of paraphilic disorder—a chronic condition affecting Garza's emotional or volitional capacity—and found that Garza showed behaviors consistent with, but insufficient to diagnose him with, antisocial personality disorder.

Dr. Dunham weighed factors for and against the likelihood that Garza would reoffend. Protective or mitigating factors against Garza's reoffending included Garza's age (63), Garza's general good behavior while incarcerated, and Garza's lack of victims who were strangers, male, or not related to him. Factors suggesting Garza would reoffend included his subsequent offense after detection, offending while in a

---

[11]It is undisputed that Garza was convicted of four counts of indecency with a child by contact, and that sentences were imposed for all four counts. Garza denies that he committed the crimes for which he was convicted, but he offered no evidence that he was not convicted or that he was not sentenced. A repeat sexually violent offender is a person who is convicted of more than one sexually violent offense and a sentence is imposed, irrespective of whether the person admits to the offense. Tex. Health & Safety Code Ann. § 841.003(b); *see In re Commitment of Barrientos*, No. 01-17-00649-CV, 2018 WL 3384563, at *4 (Tex. App.—Houston [1st Dist.] July 12, 2018, pet. denied) (mem op.).

relationship with a consenting partner, patterns of behavior spread out over time, and Garza's behaviors consistent with antisocial personality disorder.

Garza argues that protective factors outnumber his negative risk factors. In addition to those Dr. Dunham considered, Garza lists other protective factors that he argues mitigate his risk to reoffend: his lack of noncontact sexual offenses such as indecent exposure; his having had fewer than four prior sentencing events; his lack of violent convictions other than sexually violent convictions; and his score on the Static-99R and moderate psychopathy score on the PCL-R. He argues that his denial and minimization of his offenses militates neither for nor against his recidivation because pathological denial and actual innocence would manifest as effectively the same behavior. This argument asks us to weigh the evidence in his favor against the evidence in favor of the verdict and make a determination as to its credibility and substitute our judgment for the jury's.

However, the jury is the "sole judge of the credibility of witnesses and the weight to be given to their testimony." *Stoddard*, 619 S.W.3d at 674 (quoting *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)). Viewing the evidence in the light most favorable to the verdict, which we are required to do, we conclude that a reasonable jury could have put more weight on Dr. Dunham's conclusions based on his consideration of these and other factors and found that Garza suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual

20

violence. *See In re Commitment of Ivie*, 687 S.W.3d 526, 539–40 (Tex. App.—Eastland 2024, no pet.).

### IV. CONCLUSION

Because legally sufficient evidence exists to support the jury's findings as to Garza's behavioral abnormality, we overrule Garza's sole issue and affirm the trial court's judgment. *Id.*

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: January 16, 2025